## Gilreath v. Stephens

(Decided September 24, 1914.)

### Appeal from Whitley Circuit Court.

Deeds—Action to Cancel Tax Deed—Evidence.—In an action to cancel a tax deed, the question being one of fact, evidence examined and held sufficient to authorize the judgment canceling the deed.

TYE & SILER for appellant.

STEPHENS & STEELEY for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

The matter in dispute is the ownership of the coals underlying about 100 acres of land in Whitley County. The whole title originally belonged to the appellee H. T. Stephens. By two separate deeds dated in 1906 and 1909, Stephens sold the surface and farming rights to the appellant, Gilreath. The deeds specially reserved the coals to Stephens. In 1909, by order of the Auditor of Kentucky, a revenue agent advertised and offered for public sale 1,254 acres of land, which several years before had been bid in by the Commonwealth at a sheriff's sale for taxes owing by Champ Duncan for the year 1892. The 1,254 acres were described on the tax book as the property of Champ Duncan, situated in Jellico Precinct (Whitley County), adjoining the lands of R. Stephens. At this sale by the revenue agent the appellant, Gilreath, was the purchaser. The only land he

claims to have acquired under the sale is the 100 acre tract, the surface of which he had previously purchased of appellee. So that by virtue of this tax deed, he claims to be the owner of the coals, as well as the surface.

Stephens instituted this action for a cancellation of the tax deed, the same being a cloud upon his title to the coals, the right to which he had reserved in his deed to Gilreath.

The appellant admits "that if Champ Duncan never owned the land, or any interest therein, then the tax deed conveyed no title to appellant. Therefore, the sole question for consideration is, whether or not appellee, Stephens, prior to 1892, sold the land in question to Champ Duncan and put him in possession thereof." It is further conceded that if Champ Duncan ever had any title to the land it was by purchase of the appellee, Stephens. Gilreath claims that a few years prior to 1892, Duncan made a contract with Stephens for the purchase of the land, and took possession under a title bond, agreeing to pay therefor $600, and that this sum was subsequently paid. The alleged title bond is lost and no deed was ever executed. The testimony in support of these claims is vague and unsatisfactory.

Gilreath relies upon proof to the effect that Duncan cut timber off of the land and sold it to one Creekmore; that he paid for the land out of pension money, which accrued to his mother-in-law, Mrs. Privett. The evidence shows that Mrs. Privett, about that time, got a pension of $2,000, which was turned over to Champ Duncan, and he deposited it in a bank, to his credit, at Williamsburg. Litigation at once arose between Duncan and her children, with the result that Duncan got very little, and the bank books show that Stephens got none of it. As for the timber, Creekmore and his agent swear that they bought it of Stephens and paid him for it. Duncan left the land and moved to Oklahoma, where he died a few years afterwards. Why he abandoned it, and neither his widow nor children ever asserted any claim to it is unexplained. From their testimony, it is evident that they believed he had bought and paid for it, but the facts upon which they base the belief are neither strong nor convincing. One of the children swears that he overheard his father tell Stephens to come over to his house the next morning and get the money for the

land. He does not know whether Stephens ever did come or whether the money was ever paid to him.

From all the evidence in the case, it is clear that unless Champ Duncan secured enough of the pension money with which to buy the land, he never had any other means with which to make the payment. As already indicated, it appears that the pension money was otherwise applied.

On the other hand, Stephens admits that Champ Duncan occupied the land in 1892, and for a year or more before and after that time, but says that he was a tenant only, and that he paid his rents with a division of crops. He admits that Duncan did talk to him of buying it, and that he did agree to sell it to him if Duncan could get the money to pay for it, but he never succeeded in this, and no trade was ever made.

It is further shown that Stephens listed and paid the taxes on this land for the year 1892, and that when he sold the surface in 1906, to appellant, he had owned it for thirty years and kept it listed and tax paid during all of that time. The Champ Duncan in question never owned any land, unless it was the 100 acres involved here, and for that reason, it is difficult to understand how 1,200 acres should be listed in his name. There was another Champ Duncan living in the county, but neither of them was a land owner.

The tax book for 1892 shows that the Champ Duncan 1,200 acres were listed as adjacent to R. Stephens. No man of that name lived adjacent to or anywhere near this land.

The judgment of the lower court canceled the tax deed and held the title to the coals to be in appellee, Stephens. The question being one of fact, we are of the opinion that the evidence abundantly sustains the judgment, and it is, therefore, affirmed.